No. 36,982

ESTELLA LOFTIN, *Appellee,* v. THE CITY OF KANSAS CITY, *Appellant.*

(190 P. 2d 378)

Opinion filed March 6, 1948.

*James H. Barnes* and *William H. Towers,* deputy city attorneys, argued the cause, and *Alton H. Skinner,* city attorney, *C. W. Brenneisen, Jr., Joseph A. Lynch* and *Russell L. Stephens,* deputy city attorneys, were with them on the briefs for the appellant.

*Charles S. Schnider,* of Kansas City, argued the cause, and *Joseph Cohen* and *Sol M. Weinstein,* both of Kansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

THIELE, J.: Plaintiff commenced this action to recover for damages alleged to have been sustained by her because of a defect in a

street of the defendant city. Issues were joined and as a result of trial, the jury returned a verdict in favor of plaintiff. Defendant's motion for a new trial was denied and it appeals.

Omitting formal allegations it was alleged in the petition that on January 5, 1945, at 10:00 o'clock p. m. plaintiff was walking eastwardly on the north side of Freeman avenue and when she reached a point about in front of 1134 Freeman avenue, she was caused to trip and stumble over an iron water shutoff box about four inches in diameter, located at the point mentioned, which box was suffered and permitted to protrude above the level of the unpaved street about four or five inches, and she was caused to fall and to suffer a dislocation of the second toe of her left foot and various bruises and contusions over her body, and that her injuries were due to and caused by the negligence of the city in that it suffered the street, at the point, to be in dangerous and defective condition in that it permitted the water shutoff box to be and remain protruding four or five inches above the level of the street, in failing to repair the defect, in failing to barricade it or to give warning when the city knew of the defect. She further alleged that prior to the accident she was a strong able-bodied woman earning $35 a week as an insurance agent and as a result of the accident she had lost her earnings from employment. She also alleged that on February 8, 1945, she had filed her claim with the city clerk and a copy was attached as an exhibit. It needs no particular mention. She prayed for damages in the sum of $5,000.

The gist of the city's answer was a general denial and a plea of contributory negligence.

Before reviewing the evidence we may say that from the abstracts and briefs we glean the following: Freeman avenue runs east and west and in the block between Eleventh and Twelfth streets, the east half is paved and the west half, which slopes sharply downward to the west, is unpaved, and in that portion there are no sidewalks or curbings and no so-called parkings. On the south side of the west half of the block there are no houses, but on the north side there are six or seven houses of which No. 1134 is one. The water shutoff box mentioned in the pleadings and evidence was installed in 1923 and in 1927 the water main was lowered but the box was not disturbed. The box is located in the street about eleven to fifteen feet south of the property line of 1134 Freeman avenue.

Plaintiff as a witness in her own behalf testified as to her occupa-

tion as a life insurance solicitor and that her average earnings were $35 per week; that on the night of January 5, 1945, she went to 1146 Freeman avenue to collect an insurance premium and from there she went to 1138 Freeman avenue to visit a niece and then called a taxicab to go home. When she heard the horn honk she started to the cab, walking east on the north side of the street. It may here be said that other evidence disclosed taxicabs would stop on the pavement in the east half of the block and users would go to them. As plaintiff proceeded east and when she got in front of 1134 Freeman she struck her foot against something and fell. It was dark but upon examination she discovered she had stumbled over a water cutoff box about five or six inches in diameter and protruding out of the ground four or five inches. She proceeded to the taxicab and went home where she discovered her left foot was swollen. The next day she called a doctor. She further stated that at the time she fell she was not running but was walking "kind of fast" and that she "didn't just poke along." She later testified that she had been down the street in question on at least two occasions to visit her niece; that she had been there in the daytime and knew that the street was rough; that it was a dirt street and there were no sidewalks; that on the night in question she did not keep her eyes down but walked along as usual. Her doctor testified that the second toe of plaintiff's left foot had been dislocated, the bone pushed out of its socket, and as to other details of her injuries. Another witness testified she had lived at 1146 Freeman all her life and remembered when the water cutoff box was installed; that the box was dark and protruded above the ground several inches, and that it had been in that condition "since back in the twenties." She further testified that the road was a dirt road and water washed down it making ruts and depositing gravel and "stuff" in the street; that the city had graded the road sometime prior to January, 1945, and put in some chat. The testimony of other witnesses corroborating what has been stated need not be reviewed. Several photographs were also received in evidence. They show that from the fronts of the various residences south there is nothing to indicate property lines nor where the boundaries of the street may be, no parkings, no curbings, no pathways for either pedestrian or vehicular traffic; that the street is generally rough and rutted, and, as far as photographs can disclose, that pedestrians and vehicles moved over all parts of the north side of the street. When the plaintiff rested, the city demurred, con-

tending there was a failure to show that the city had notice, either constructive or actual, of the alleged defect; that the alleged defect was not such as to be actionable and that the evidence disclosed plaintiff's contributory negligence. This demurrer was overruled and the trial proceeded. In view of the assignments of error, it is not necessary that we review the city's evidence. Under instructions, of which no complaint is made, the cause was submitted to the jury. Argument of counsel after the instructions had been given and objections thereto, will be mentioned later. The jury returned a verdict for plaintiff for $1,250 and answered special questions, which will be referred to later. The city's motions for a new trial, for judgment *non obstante* and to set aside special findings of the jury were each denied, and the appeal followed.

The demurrer to the evidence was based on three grounds which have previously been stated. The city argues together its contentions that the city had no notice of any defect and that there was no actionable defect in contemplation of law. In discussing the contentions made we need not state, but do follow our oft repeated rule, as to how the evidence is to be considered. (See, *e. g., Trezise v. Highway Comm.*, 150 Kan. 845, syl. ¶ 1, 96 P. 2d 637.) Neither do we think it necessary to review our numerous decisions holding that certain conditions or objects did or did not constitute defects. Lists of many of these decisions may be found in West's Kansas Digest, Vol. 11, "Words & Phrases," under subtitles of "Defects" and "Defective Highways," and in Hatcher's Kansas Digest under the same general title and subtitles. For present purposes we shall define a defect in the street as being a condition or object therein which makes the street unsafe and dangerous for travel and use and is the legal cause of the injury of which complaint is made. In discussing whether the mere placing of the shutoff box in the street constituted a defect, the city directs our attention to authorities that the city may devote portions of the streets for sewers, mains for water and gas and other purposes useful and convenient to the public. We need not review them for it may be conceded our statutes recognize that that may be done, instances being too numerous to mention. It may be said that the record discloses the water shutoff box was originally installed in 1923 under permit issued by the water department of the city, and that in 1927 the city lowered the water main but did not disturb the shutoff box, and that at some later date prior to the accident, that it graded the street. The

evidence disclosed that the shutoff box protruded above the ground for several inches and that the condition existed since "back in the twenties." Under the circumstances it may not be held as a matter of law that the city did not have notice of the condition and opportunity to correct it. (See *Hack v. City of Pittsburg*, 145 Kan. 383, 65 P. 2d 580.)

The real question is whether the shutoff box, projecting four or five inches above the ground according to plaintiff's evidence, constituted a defect. In an affirmative way the city relies upon our decisions in *Taggart v. Kansas City*, 156 Kan. 478, 134 P. 2d 417, and *Blankenship v. Kansas City*, 156 Kan. 607, 135 P. 2d 538. It also refers to *Hack v. City of Pittsburg*, supra, and points out where it believes that case is distinguishable from the instant case and to so-called Parkway cases which it believes are applicable: *Register v. City of Pittsburg*, 139 Kan. 753, 33 P. 2d 173; *Dargatz v. Dodge City*, 151 Kan. 747, 100 P. 2d 680; *Mead v. City of Coffeyville*, 152 Kan. 799, 107 P. 2d 711; *Gilmore v. Kansas City*, 157 Kan. 552, 142 P. 2d 699. As is to be expected in dealing with cases involving somewhat similar facts, there can be found many points of similarity or lack of it, and many statements as to the law which seem to have a bearing on the question presented. Limits of space, however, do not permit a detailed analysis of the facts of the cited cases, nor a detailing of all that was considered and held in each of them.

In the Taggart case it appeared that a slab of a cement sidewalk had been pushed up by tree roots so that it was in fact about six or seven inches above the adjacent slabs. Plaintiff saw the "step-up" and stepped up and on it but as she proceeded she did not look at the walk, did not see the step down and fell. Citing authorities, this court held that sometimes it could be said as a matter of law the imperfection was not an actionable defect; that sometimes the city would concede the condition was dangerous, but that in between were cases where the question was one for the determination of the jury, and further that the facts of the particular situation and the circumstances as to use are matters to be taken into account. Some weight was also placed by the court on the fact that plaintiff there saw the raised slab and stepped up and that she walked on without paying further attention. This court held that the evidence did not show the irregularity in the walk to be an actionable defect.

In the Blankenship case, bricks of a sidewalk had been removed, leaving a hole about fourteen by sixteen inches in shape and at least six inches deep. Citing authorities that the plaintiff must not only show the unsafe defect but that the city had actual or constructive notice thereof and a reasonable time in which to repair it before the occurrence of the accident, the court considered the evidence and, in short, said that such a hole in the sidewalk undoubtedly would be a defect which the city would not be justified in leaving in the walk if it knew the defect existed. It was held there was no evidence of notice to the city that the defect existed, and that the city's demurrer to the plaintiff's evidence should have been sustained.

In the Hack case, recovery was allowed. There was considerable similarity in the factual situation. The city, however, seeks to draw this distinction. In that case it was said the plaintiff was walking in the middle of the street where "she was compelled to walk if she were going to walk at all." The city argues that while there the pathway was clear, in the case at bar the plaintiff was angling across the unpaved street and not in the smoothest and best part; that she, for her own purposes and voluntarily, used a portion not set aside for and not intended for pedestrian traffic, and that that case is no authority to permit her recovery. The argument has inherent in it contributory negligence which will be treated later, but we may say that the argument is based on a version of the evidence unfavorable to the plaintiff and under the rule applicable, may not be so considered by us.

We cannot agree that the so-called "Parkway Cases" are decisive. It will not do to say the defect here was in the parkway and in a place not ordinarily used for pedestrian travel. So far as the evidence discloses there was no pathway nor other place of usual use by pedestrians—they seem to have used perhaps a part of the private property, but certainly did use the north part of Freeman avenue for travel. There was in that part of the street no curbs or guttering, no parking, and so far as the evidence disclosed, use of all parts of the street was indiscriminate. Neither was there any showing of plaintiff's knowledge that the shutoff box existed. Under the circumstances it may not be said as a matter of law that the presence of the shutoff box in the condition the evidence showed it to be, was not an actionable defect.

The city also contends that plaintiff's evidence shows she was

guilty of negligence which contributed to her injuries. This argument is predicated on plaintiff's testimony that she had previously been on the street on three or four occasions, and was aware that the street was in a rough condition. Stress is laid on her testimony that she walked right along and did not keep her eyes down and look where she was going. It may be said in this connection that the accident happened at night and there is testimony that there were no lights sufficient to light up the street in front of 1134 Freeman avenue. In support of its contention, the city argues that plaintiff had knowledge of the defective condition and was charged with the responsibility of using due care for her own safety and did not do so, and cites in support *Taggart v. Kansas City,* supra; *Blankenship v. Kansas City,* supra; *Billings v. City of Wichita,* 144 Kan. 742, 745, 62 P. 2d 869; and other cases where the matter has been discussed. We shall not review these cases. We may not interpret the evidence as showing that plaintiff was aware of the protruding shutoff box, nor if she were that she failed to use due care, and in such circumstances we may not conclude as a matter of law that plaintiff was guilty of negligence which precludes her recovery.

The city next contends the trial court erred in denying its motion for a new trial. Although other grounds were alleged, the particular matter now urged is misconduct of counsel for plaintiff in his argument to the jury.

As disclosed by the abstract, when counsel for plaintiff started making his final argument, the court reporter was not present. However, it is not disputed that counsel made a statement to the general effect that if the jury did not return a verdict for plaintiff it would be notice to the city that it need not keep other streets in the city in repair. Out of the hearing of the jury the city objected that the argument was an appeal to passion and prejudice and indirectly for punitive damages. The court then instructed the jury its verdict would be based on the evidence and not on the argument. The court reporter made a record of the remainder of the argument. Counsel for plaintiff then continued,

"And Members of the Jury, referring again to where I left off. If you let the City go in this case, you will be upholding their actions, as specifically done in this case, of leaving streets like Freeman between Eleventh and Twelfth unattended and unrepaired for twenty some odd years, whatever the evidence was in this case."

The city renewed its objections and the court then stated there

was no evidence as to other streets and that part of the statement would not be considered by the jury. Counsel then continued,

"And by bringing in a verdict in favor of the plaintiff in this case, you will be saying to the contrary, Members of the Jury, to the officials and to the employees of the City of Kansas City, Kansas, who are charged with the obligation of taking care of the citizens, of maintaining and keeping your streets clear and safe for public and pedestrian travel, you do a job instead of wasting their money in court here defending, with two or three lawyers up here two days at a time—and they should be down there fixing those streets."

The city again objected and finally moved that the jury be discharged. This motion was denied and the argument proceeded on other matters. We note only the close of the argument wherein counsel directed attention to a hypothetical question he had asked three doctors, that the jury heard the answer and that it was up to the jury to figure how much above the $250 of actual damages the plaintiff should have for being in bed three weeks and being on crutches for three weeks more and that counsel thought the verdict should be for $2,500.

In her counter abstract plaintiff has included the trial court's remarks when ruling upon and denying the city's motion for a new trial. Limits of space do not permit a detailed recital, but the court stated that in determining whether a jury acted through passion or prejudice the trial court above any other court is better able to judge the fact; that this jury was a pretty high type of jury—a pretty good cross section of Wyandotte county people—at least the jury so impressed the court. After making reference to some of the evidence as to the condition of the street and to the shutoff box, the court stated plaintiff made a pretty good witness for herself and impressed the court as attempting to tell the facts as she knew them; that the court heard the arguments and that they did not come under the category of those that could possibly cause the particular jury or maybe any other jury to become biased and prejudiced and try to penalize the city and it was sure that effect was not had on the jury. After making some reference to the evidence as to pain and suffering and that the court knew of no rule by which the amount to be allowed for any particular pain and suffering could be judged, it stated the verdict was not excessive.

We notice first the plaintiff's argument that the trial court did not err. She contends there was no misconduct, but if there were, the trial court promptly corrected any possible error by its instruc-

tions. In support she directs attention to some of our decisions including the four hereafter mentioned.

In *Bortnick v. Cudahy Packing Co.*, 119 Kan. 864, 241 Pac. 442, plaintiff's counsel, in argument, used language set out in the opinion, but, on objection, the jury was directed not to regard it, and then followed a colloquy to which the defendant objected. In its opinion this court minimized the reprehensibility of the language and stated we could not assume the jury would be swayed by the argument when the trial court ruled in the presence of the jury it was not proper, and observed that any verdict amounted to nothing until it had the trial court's approval.

In *Murphy v. Edgar Zinc Co.*, 128 Kan. 524, 278 Pac. 764, the alleged misconduct was during the course of the trial, as is shown in the opinion. This court stated that any attempt to justify the remark complained of would be vain, but without any semblance of approval, we thought the trial court took care of the situation by his rulings and appropriate remarks, and stated the general rule that ordinarily where the trial court had directed the jury to disregard matters and with full knowledge had approved a verdict and overruled a motion for a new trial, this court would not reverse, citing cases in support.

In *Bagnall v. Hunt*, 131 Kan. 805, 293 Pac. 733, the court stated that our rule is that an improper remark made in argument which is stricken out by the court with the admonition to the jury to disregard it, does not necessarily constitute reversible error, and to overturn the verdict prejudice must be shown. Cases in support are cited.

In *Richard v. Kilborn*, 150 Kan. 579, 95 P. 2d 545, the question arose over alleged improper argument concerning an answer to a special question submitted, and on objection the court admonished counsel his argument was improper. This court, in discussing the matter, stated the comment was improper and not condoned. The trial court, however, had stated it did not regard the comment sufficiently prejudicial to require a new trial, and we agreed, holding that before a judgment will be reversed for misconduct of counsel of the prevailing party, it must appear the misconduct prejudiced the rights of the defeated party.

The city does not contend that the general rule is otherwise than as above stated, but does contend that repeated improper remarks call for invoking of another rule. In support the city directs our

attention to cases including the four next discussed. In all of these cases the trial court had denied motions for a new trial and had rendered judgment.

In *Zimmerman v. Kansas City Public Service Co.*, 127 Kan. 398, 273 Pac. 172, the alleged misconduct occurred during the course of the trial as well as in closing arguments. This court, in reversing a judgment and granting a new trial, said:

"Misconduct of counsel for the plaintiff continued during the entire trial, and no doubt can be reasonably entertained that it resulted in prejudice to the defendant. Whether or not it did so result the judgment should be reversed because conduct of the kind shown by the record in this case should result in setting aside a verdict and granting a new trial wherever the verdict has been secured by counsel who have been guilty of such conduct.

"Other matters are presented by the defendant which appear to have merit in them. They are not discussed because this court has often admonished the bar that continued misconduct in the trial of cases may result in a verdict for the prevailing party being set aside. (*Tidball v. Railway Co.*, 97 Kan. 396, 155 Pac. 938; *Mischlich v. Morris & Co.*, 105 Kan. 63, 181 Pac. 619.)" (l. c. 399.)

In *Majors v. Seaton*, 142 Kan. 274, 46 P. 2d 34, a judgment in favor of plaintiff was reversed because of unwarranted reference to extraneous matters coupled with inflammatory remarks by counsel for the prevailing party.

In *Martin v. Kansas City*, 150 Kan. 927, 96 P. 2d 646, a judgment in favor of plaintiff was reversed because of counsel's persistence in keeping before the jury the inference that a casualty company, not before the court, would ultimately pay any judgment rendered against the city.

In *Taylor v. F. W. Woolworth Co.*, 151 Kan. 233, 98 P. 2d 114, plaintiff's counsel said in his opening statement that the defendant could pay for experts but the plaintiff couldn't, and when objection was made, called attention to the fact the court reporter was making a record, later he charged that all the witnesses worked for defendant, and in closing argument made remarks about opposing counsel, all as more fully detailed in the opinion. Plaintiff obtained a judgment. Defendant's motion for a new trial was denied and it appealed. Without repeating the preliminary analysis made this court said:

"Upon examination of all of the facts and circumstances shown by the instant record it is our opinion that unwarranted latitude was permitted counsel for the plaintiff in his argument, outside the record, and that the only purpose and the probable effect of the improper comments heretofore quoted

were to produce a prejudicial attitude toward the defendant on the part of the jury and thus prevent a fair and impartial trial." (l. c. 242.)

It may here be noted that the eight cases above referred to are all representative of a large number and that some of them contain citation of many others we have not reviewed. All of those cases show general rules to be applied, but to a considerable extent each case is distinguishable from others and from the case at bar. Many of the cases deal with single instances of alleged misconduct where the court admonished counsel and gave instruction to the jury. Other cases treat of repeated instances of misconduct and generally they have resulted in reversals.

A review of what transpired in the case at bar shows that although the argument complained of was couched in somewhat similar phraseology, each repetition became increasingly subject to objection. Had the matter ceased when the first objection was made and the jury instructed, we might well overlook it. Counsel, however, paid no attention to the admonition, and the second objection was met with comment by the court that there was no evidence as to part of the statement and that part would not be considered by the jury. Then followed the third instance, which was more inflammatory than the first two. Although objection was made, the only ruling was to deny a motion to discharge the jury—there was no instruction to the jury. We appreciate the view taken by the trial court in denying the motion for a new trial but are of opinion it stopped short of a full consideration of the matter. Plaintiff's counsel persisted in his comment—he had no purpose unless it was to create a feeling unfriendly to the city based on matters outside the record, and not even the subject of fair debate. It will not do to say that because the verdict was not for a great amount that prejudice did not exist. Plaintiff's own counsel admits her financial loss was not over $250. The record discloses the extent of her injury was a broken toe and some bruises and that she was substantially fully recovered in six weeks or less. The purpose of the inflammatory argument, predicated in part on matters extraneous to the record, was to bias and prejudice the jury. It is not a sole test that if the verdict is large there has been error, and if it is small there has not been. The test must consider the purpose sought to have been served by the improper conduct. The court is of opinion that in this case, counsel for plaintiff by his conduct prevented a fair and

impartial trial, and that the judgment in favor of plaintiff must be reversed and a new trial had.

The city also presents a contention that the trial court erred in not setting aside certain answers made by the jury to special questions submitted. In view of our conclusion there must be a new trial, the contention is moot.

The city also presents a contention that its motion for judgment *non obstante* should have been allowed. No purpose is to be served by setting out the questions and answers. The motion concedes the answers are supported by the evidence. The answers made are not in conflict with the general verdict, in fact they are in accord with it.

The judgment of the trial court is reversed and the cause remanded with instructions to grant a new trial.

WEDELL, J. (concurring in part and dissenting in part): I concur in all parts of the opinion except syllabus paragraph 3 and the corresponding portion of the opinion. Manifestly I do not believe this court should condone conduct of counsel which is prejudicial to the rights of the opposing party. I agree some of the remarks should not have been made. With that view the trial court agreed. The problem confronting the trial court under these circumstances was whether the remarks resulted in prejudice to the defendant. After giving careful consideration to the entire record I can believe that these remarks may have been not only nonprejudicial to the defendant but may actually have resulted in some feeling against plaintiff and plaintiff's counsel. These things were all matters which we cannot assume the trial court overlooked.

The record shows the trial court knew this jury. The trial court placed its refusal to grant a new trial primarily on the caliber of *this particular jury* and concluded the remarks complained of did not prejudice defendant before *this jury*. In view of such circumstances I hesitate to overthrow the judgment of the trial court.

We have often stressed the fact in our opinions that a trial court should be frank with this court in stating whether or not it approved a particular verdict in view of all the facts and circumstances. This trial court did precisely that. It did not hedge. In referring to the arguments the court frankly stated that, *"In my absolute definite opinion* . . . [these arguments] . . . do not come under the category of those that could possibly cause *this particular jury at least,* or maybe any other jury, to become biased and prejudiced and try to penalize the city . . . *I am sure* it

didn't have that effect *on this jury* . . . *this jury I am sure* came to a reasonable conclusion from all of the evidence . . . ." (Our emphasis.)

Later the court further said, "Therefore, I don't think that the verdict is at all excessive."

In final conclusion the court frankly stated, "All and all I have *no hesitancy* in approving this verdict." (Our italics.) In view of such clear and pronounced views I am not willing to substitute our judgment for that of the trial court on the point in question.

SMITH, J., concurs in the foregoing dissenting opinion.